**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **SFEG CORP.,** | ) | |
| | ) | |
| **Plaintiff / Counter-defendant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:15-cv-0466** |
| | ) | **Judge Aleta A. Trauger** |
| **BLENDTEC, INC., d/b/a BLENDTEC,** | ) | |
| | ) | |
| **Defendant / Counter-claimant.** | ) | |

## MEMORANDUM

SFEG Corp. ("SFEG") filed this action in the Williamson County Chancery Court in April 2015; Blendtec, Inc. ("Blendtec") removed the matter to this court on the basis of diversity jurisdiction and brought counterclaims. Now pending are: (1) Blendtec's Motion for Partial Summary Judgment Limiting SFEG's Damages (Doc. No. 61); (2) Blendtec's Partial Motion for Summary Judgment on SFEG's 11th and 12th Affirmative Defenses, or, In the Alternative, That SFEG's "Terms and Conditions of Sale" Are Not Part of the Contract (Doc. No. 65); and (3) SFEG's Motion for Summary Judgment (Doc. No. 70).

The motions have been fully briefed and are ripe for review. No hearing is necessary. For the reasons set forth herein, the court will grant both of Blendtec's motions and deny SFEG's motion.

## I. FAILURE TO COMPLY WITH LOCAL RULES

Local Rule 56.01(b) requires a party seeking summary judgment to provide a "separate, concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Local Rule 56.01(c) requires the party opposing the motion for summary judgment to respond to the statement of undisputed facts by "either (i) agreeing that the fact is

undisputed; (ii) agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or (iii) demonstrating that the fact is disputed. Each disputed fact must be supported by specific citation to the record." In addition, "the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which . . . there exists a genuine issue to be tried." *Id.*

Here, in responding to its opponent's statement of facts, Blendtec in particular took substantial liberty in presenting its case rather than simply disputing a statement and citing to the record, as required by the Local Rule. For example, Blendtec's response to ¶ 6 of SFEG's Statement of Undisputed Facts ("Northland's parts were not defective in material, workmanship, or title.") (Doc. No. 88, at 5) goes on for almost eight pages and consists of more argument than fact. (*Id.* at 5–12.) "Argument in responses to statements of material facts clouds issues and encumbers the court with motions-within-motions." *Maverick Grp. Mktg., Inc. v. Worx Envtl. Prods., Inc.*, 99 F. Supp. 3d 822, 827, (W.D. Tenn. 2015), aff'd, 659 F. App'x 301 (6th Cir. 2016). Moreover, the appropriate means of introducing additional disputed facts into the record would have been by providing a separate statement of additional disputed facts. The difficulty posed by Blendtec's responses to SFEG's Statement of Undisputed Facts required the court to scour the record to piece together the relevant facts rather than relying on the parties' summaries of the facts. In the future, the court will either accept the facts as undisputed or require correction and resubmission of such a response.

The court will nonetheless proceed to address the substance of the parties' motions as submitted.

## II.     LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment on a particular claim by an adverse party, the moving defendant must show that there is no genuine issue of material fact as to at least one essential element of that claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Ferro Corp. v. Cookson Group, PLC*, 585 F.3d 946, 949 (6th Cir. 2009). "[S]ummary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United*

*States*, 929 F.2d 240, 248 (6th Cir. 1991) (citations omitted).

## III.     FACTUAL AND PROCEDURAL OVERVIEW

This action is a dispute between a seller, SFEG,[1] and a buyer, Blendtec, regarding the terms of their commercial transactions. There is no dispute that Blendtec, whose principal place of business is in Orem, Utah, manufactures and sells blending machines. SFEG is a Delaware corporation whose principal place of business is in Fairview, Tennessee. SFEG designs and manufactures electrical power products. In February 2011, SFEG agreed to begin manufacturing and supplying certain component parts for Blendtec's use in its blender motors.

Blendtec initially requested that SFEG manufacture two motor parts known as armatures and fields. The parties refer to these parts collectively as "part sets." A commutator is a component of the armature, and the armature is placed inside of the field. (Mason Dep. excerpt, Doc. No. 86-5, at 2.) After six rounds of testing over the course of a year and a half, Blendtec gave SFEG approval to begin large-scale production of the part sets, and Blendtec began issuing purchase orders for the part sets.

In December 2012, Blendtec asked SFEG to supply brushes for its blenders. A brush is an electrical component part that conducts current between stationary wires and moving parts. Each brush fits into brackets within a field. (Doc. No. 86-5, at 3.) Each Blendtec blender motor incorporates two brushes. In April 2014, Blendtec began issuing purchase orders to SFEG for brushes.

By March 2015, the parties' relationship had completely unraveled. SFEG filed suit against Blendtec on March 18, 2015 in state court; Blendtec removed the action to this court on the basis of diversity jurisdiction. SFEG filed an Amended Complaint (Doc. No. 14) on June 29,

---

[1] "Northland" is one of SFEG's three divisions. (Mason Decl. ¶ 3, Doc. No. 73-13.) The parties refer to SFEG interchangeably as both Northland and SFEG.

2015, asserting, as it had in the original Complaint, claims for breach of contract and conversion and seeking damages in the amounts it alleges are owed to it for motor parts and brushes already shipped, a finance charge under the Terms & Conditions, and other damages including the value of the product ordered but not shipped, lost profits on the portion of purchase orders not shipped, the cost of retooling, pre- and post-judgment interest, punitive damages, attorney fees, costs and expenses.

Thereafter, Blendtec filed an Answer, denying liability, and a Counterclaim, alleging that SFEG's part sets and brushes were defective. (Doc. No. 15.) As Affirmative Defense number 11 to Blendtec's Counterclaim, SFEG asserts that Blendtec's claim for consequential damages is barred by paragraph 11 of SFEG's Terms & Conditions. (Answer to Countercl., Doc. No. 16, at 5.) As Affirmative Defense number 12, SFEG asserts that Blendtec's claims generally are barred by the waiver of warranties contained in the Terms & Conditions. (*Id.*)

Now pending are Blendtec's Motion for Partial Summary Judgment Limiting SFEG's Damages (Doc. No. 61) (the "Damages Motion"); Blendtec's Partial Motion for Summary Judgment on SFEG's 11th and 12th Affirmative Defenses, or, In the Alternative, That SFEG's "Terms and Conditions of Sale" Are Not Part of the Contract (Doc. No. 65) (the "Terms & Conditions Motion"); and (3) SFEG's Motion for Summary Judgment (Doc. No. 70), which incorporates, among other matters, a discussion of the enforceability of its Terms & Conditions.

Many of the specific facts—or the inferences to be drawn from them—are disputed. To the extent practicable, the court will address each motion separately, in conjunction with the facts relevant to that motion.

## IV.    THE TERMS & CONDITIONS MOTION

### A.    Relevant Facts

Between December 29, 2011 and March 3, 2015, Blendtec sent SFEG approximately 32 separate Purchase Orders ("POs") for component parts used in production runs of Blendtec's blenders, as well as non-production run samples, pilot lots, and return orders, although the precise number is disputed. (*See* Def.'s Resp. to Pl.'s Statement of Undisp. Facts ¶ 1, Doc. No. 88; Pl.'s Resp. to Def.'s Statement of Undisp. Facts ¶¶ 5, 6, 13, Doc. No. 79; Wilson Decl. Ex. A, Doc. No. 104-1.) The Purchase Orders for production runs were for component parts that Blendtec planned to install or did install in its blenders that were for sale. (Doc. No. 79 ¶ 5.)

Blendtec's POs included the PO number, a description of the items being ordered, the quantity being ordered, the per unit and total price, and payment terms. (*Id.* ¶ 14.) After receiving a PO from Blendtec, SFEG's practice was to email Blendtec an Order Acknowledgement confirming the terms of the PO. (*Id.* ¶ 7.) Among other things, SFEG's Order Acknowledgments referenced Blendtec's PO number and included a description of the items being ordered, the quantity ordered, the per unit and total price, and payment terms. (*Id.* ¶ 15.) SFEG usually, but not always, sent an Order Acknowledgement upon receipt of a PO from Blendtec. (*Id.* ¶ 9.)

In addition to the Order Acknowledgement, SFEG sometimes, but not always, sent its Terms and Conditions of Sale ("Terms & Conditions") to Blendtec in response to its POs. (*Id.* ¶¶ 10–13.) Among other things, the Terms & Conditions include language specifying that SFEG's acceptance of any purchase order was "expressly subject" to Blendtec's assent to the conditions set forth in the Terms & Conditions:

> 1.     Acceptance: The Seller's acceptance of any order is expressly subject to Buyer's assent to each and all of the terms and conditions set forth below. Any additional or different terms and conditions submitted by Buyer shall be deemed objected to by Seller and shall be of no effect nor in any circumstances binding upon Seller unless accepted by Seller in writing. If Buyer objects to any of the terms and conditions said objections must be specifically brought [sic] the attention of Seller by Buyer by a written instrument separate from any purchase order or other printed form of Buyer. Said objections shall be deemed proposals

for different terms and conditions and may be accepted only by a writing executed
by an authorized representative of Seller at its offices in Fairview, TN, U.S.A.

(*Id.* ¶ 16; Doc. No. 64-7, at ¶ 1.) In addition, the Terms & Conditions provide for payment of a late fee ("finance charge") by Buyer for any payments not made within 30 days of the invoice date; an express warranty that the equipment manufactured by SFEG would be free from defects in material, workmanship and title as of the date of shipment; a disclaimer of all other implied or statutory warranties; and a disclaimer of liability for damages. (Doc. No. 64-7 ¶¶ 5, 10, 11, 22.)

Blendtec's POs are silent on the terms found at paragraphs 1, 5, 10, 11, and 22 of SFEG's Terms & Conditions. (Doc. No. 97 ¶ 17.) Blendtec apparently possessed a document that incorporated its own terms and conditions, but Blendtec never provided SFEG a copy of its terms and conditions.

It is undisputed that Blendtec never expressly objected or assented to SFEG's Terms & Conditions. It accepted shipment of product from SFEG and continued to place orders with it, after having repeatedly received copies of the Terms & Conditions along with SFEG's shipments.

### B.    Discussion

In its Terms & Conditions Motion, Blendtec asserts that it is entitled to summary judgment on SFEG's Affirmative Defenses 11 and 12 on the basis that SFEG's Terms & Conditions are not, as a matter of law, part of the parties' contract. SFEG opposes that motion and asserts that, at a minimum, there are disputed issues of fact as to whether Blendtec's "continued silence in the face of receiving [SFEG's] Terms and Conditions constitutes assent" to them. (Doc. No. 78, at 2.)

SFEG also seeks summary judgment in its favor, in part, on the basis that all of the Purchase Orders are governed by SFEG's Terms & Conditions, which bar Blendtec's affirmative

defenses and Counterclaim. (Doc. No. 71, at 11.) In the alternative, SFEG argues that, "even

under the UCC default rules, Blendtec's defense and counterclaim fail as a matter of law." (*Id.*).

In its Reply in support of its own motion, SFEG changes tack, insisting that its "argument is *not*

that silence or inaction constitutes acceptance," but that "Blendtec's repeated ordering, in the

face of [SFEG's] terms and conditions, and without validly sending [SFEG] any competing

terms and conditions, is a course of dealing that constitutes acceptance to [SFEG's] terms and

conditions." (Doc. No. 100, at 3.)

### 1.     *Section 2-207 of the Uniform Commercial Code*

This matter concerns the terms of a sales contract between merchants. Consequently,

Article 2 of the Uniform Commercial Code ("UCC"), and specifically § 2-207 of the UCC,

applies to the dispute. [2] As implemented in Tennessee, that section states:

> (1) A definite and seasonable expression of acceptance or a written confirmation
> which is sent within a reasonable time operates as an acceptance even though it
> states terms additional to or different from those offered or agreed upon, unless
> acceptance is expressly made conditional on assent to the additional or different
> terms.
>
> (2) The additional terms are to be construed as proposals for addition to the
> contract. Between merchants such terms become part of the contract unless:
>
>> (a) the offer expressly limits acceptance to the terms of the offer;
>>
>> (b) they materially alter it; or

---

[2] The parties do not dispute the application of Tennessee law or argue that there is any significant difference between the UCC as enacted by Tennessee and the version enacted in Utah. The court therefore finds that there is no conflicts of law problem. *Compare* Tenn. Code Ann. tit. 47 *with* Utah Code tit. 70a (both enacted with Official Comments). In any event, a federal court sitting in diversity applies the choice of law rules of the forum state. *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009). Tennessee is the forum state, and Tennessee's applicable choice of law rule is that, when a transaction bears a reasonable relationship to both Tennessee and another state, and the parties have not agreed on which state's law applies, then Tennessee's enactment of the UCC applies. *Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co.*, 823 F. Supp. 2d 786, 801 (W.D. Tenn. 2011) (citing Tenn. Code Ann. § 47-1-301).

(c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chapters 1–9 of this title.

Tenn. Code Ann. § 47-2-207 ("Section 2-207").

This provision of the UCC "recognizes that in current commercial transactions, the terms of the offer and those of the acceptance will seldom be identical." *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1166 (6th Cir. 1972). Under the resulting "battle of the forms, each party typically has a printed form drafted by his attorney and containing as many terms as could be envisioned to favor that party in his sales transactions." *Id.* In the usual scenario, the parties never discuss or agree to the new terms, but the seller ships the goods and buyer accepts them as if there were a contract. *Id.* Section 2-207 defines what terms govern when a dispute arises between the seller and buyer and the dueling forms suddenly become relevant.

Under the common law, changed or additional terms in an order acknowledgment would be construed as a counteroffer accepted by the original offeror when he proceeded to perform under the contract without objecting to the changed or additional terms. *Dorton*, 453 F.2d at 1166. Section 2-207(1) of the UCC effected a significant change to the common law. Under the UCC, "[a] definite and seasonable expression of acceptance or a written confirmation . . . operates as an acceptance," rather than a counteroffer, even if it proposes terms that are additional to or different from those in the offer. However, Section 2-207(1) is subject to a "proviso": if a definite and seasonable expression of acceptance expressly conditions acceptance on the offeror's assent to additional or different terms contained therein, the parties' differing

forms do not result in a contract unless the offeror expressly assents to the additional terms. *Dorton*, 453 F.2d at 1166.

If the proviso is *not* implicated and a contract is formed under § 2-207(1), the additional terms are treated as "proposals for addition to the contract" under § 2-207(2). *Dorton*, 453 F.2d at 1166. If, on the other hand, no contract is recognized under § 2-207(1), typically because the offeree's acceptance is expressly conditioned on the offeror's assent to the additional or different terms and the offeror did not expressly assent, "the entire transaction aborts at this point." *Dorton*, 453 F.2d at 1166. That is, the parties' writings do not form a contract. If the parties' *conduct* nonetheless recognizes the existence of a contract, § 2-207(3) comes into play; that subsection provides for the determination of the terms of that contract. "In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions" of the UCC. § 2-207(3).

### 2.     Application of § 2-207(1) to the Facts

In this case, each of Blendtec's Purchase Orders functioned as an offer. SFEG typically responded to such offers with an Order Acknowledgement, sometimes sent with its Terms & Conditions. Because the Terms & Conditions contain additional terms that are not in the Purchase Orders, the case presents a typical battle of the forms.[3]

The Terms & Conditions include language that essentially mirrors that of the § 2-207(1) proviso: "The Seller's acceptance of any order is expressly subject to Buyer's assent to each and

---

[3] In its motion for summary judgment, SFEG argues half-heartedly that there is no battle of forms, because Blendtec did not incorporate any terms and conditions into its Purchase Orders. It does not, however, dispute that Blendtec's POs constituted offers and that § 2-207 applies. *Accord Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1442 (9th Cir. 1986) (noting that "[o]ne intended application of section 2-207 is to commercial transactions in which the parties exchange printed purchase order and acknowledgment forms" (citing U.C.C. § 2-207 cmt.1)).

all of the terms and conditions set forth below." (Doc. No. 64-7, at ¶ 1.) *See Dorton*, 453 F.2d at 1168 (to fall within the "Subsection 2-207(1) proviso," "an acceptance must be expressly conditional on the offeror's *assent* to [the offeree's additional or different] terms"). SFEG's Terms & Conditions, which are indisputably additional and different terms from those in Blendtec's Purchase Orders, therefore only became part of the parties' contract if Blendtec assented to them. Blendtec insists that it did not assent; SFEG claims that it did.[4]

Undoubtedly anticipating that Blendtec would never expressly assent to the limitations of warranties and liability contained in its Terms & Conditions, SFEG drafted the Terms & Conditions to indicate that silence on the part of Blendtec signaled assent: "If Buyer objects to any of the terms and conditions said objections must be specifically brought [sic] the attention of Seller by Buyer by a written instrument separate from any purchase order or other printed form of Buyer." (Doc. No. 64-7, at ¶ 1.) SFEG argues that Blendtec's repeated acceptance of shipments, despite receiving SFEG's Terms & Conditions at least seven times, gives rise to a jury question as to whether Blendtec assented. Blendtec insists that mere silence and acceptance of the goods shipped by SFEG could never signal assent.

SFEG relies for its position on *Ralph Shrader, Inc. v. Diamond International Corp.*, 833 F.2d 1210, 1215 (6th Cir. 1987), and *Aqua-Chem, Inc. v. D&H Machine Service, Inc.*, No.

---

[4] Blendtec points out a "factual wrinkle" that merits recognition but does not change the outcome here. (Doc. No. 65, at 6 n.3.) That is, SFEG only sent its Terms & Conditions in response to some of Blendtec's Purchase Orders, not all of them. SFEG argues that this fact does not matter because the Terms & Conditions were incorporated as a matter of the parties' course of dealing. Blendtec argues that, in those instances in which the Terms & Conditions were *not* attached, they could not have become part of the parties' contract, and if they *were* attached, then they did not become part of the parties' contract because Blendtec never expressly assented to them, as discussed herein. The court presumes for purposes of this analysis that SFEG sent its Terms & Conditions in each transaction.

E2015-01818-COA-R3-Cv, 2016 WL 6078566 (Tenn. Ct. App. Oct. 17, 2016).[5] In *Aqua-Chem*, the parties disputed the terms of a contract for services; the UCC did not apply and is not referenced in the opinion. Even if the UCC had applied, § 2-207 would not have been implicated, because there was no battle of forms. Instead, the only written manifestation of the parties' agreement was Aqua-Chem's purchase orders incorporating its terms and conditions. *Aqua-Chem* therefore has no relevance here.

In *Ralph Shrader*, the seller's acceptance fell within the § 2-207(1) proviso, giving rise to the question of whether the buyer had assented to the additional terms in the acceptance. There, as here, the seller relied on language in the acceptance requiring the buyer to "advise . . . immediately" if it did not agree to the additional terms. The Sixth Circuit held that "failure to so advise obviously does not require a conclusion of assent." *Id.* at 1215 (citing UCC § 2-207(3)). The court further held that mere acceptance of and payment for goods did not constitute acceptance as a matter of law, but nonetheless remanded the case on the basis that the question of acceptance was a jury question under Michigan law. *See id.* at 1215 (noting that, under Michigan's application of § 2-207(1), "[t]he determination of what has or has not been agreed upon will, of course, continue to be made by the trier of fact, but, in making that determination,

---

[5] In support of its own Motion for Summary Judgment, SFEG relies on two other cases that, it claims, support its argument that silence and repeated performance after receipt of an acceptance that falls within the § 2-207(1) proviso can constitute assent under that provision. The first, *Gilbert & Bennett Mfg. Co. v. Westinghouse Elec. Corp.*, 445 F. Supp. 537 (D. Mass. 1977), relied for its holding on *Roto-Lith Ltd. v. F.P. Bartlett & Co.*, 297 F.2d 497 (1st Cir. 1962). The First Circuit has expressly overruled *Roto-Lith*, thus abrogating the holding in *Gilbert & Bennett* as well. *See Ionics, Inc. v. Elmwood Sensors, Inc.*, 110 F.3d 184, 187 (1st Cir. 1997) ("We find the rule of *Roto-Lith* to be in conflict with the purposes of section 2-207 and, accordingly, we overrule *Roto-Lith* and find that subsection (3) governs the contract."). In the second, *Construction Aggregates Corp. v. Hewitt-Robins, Inc.*, 404 F.2d 505, 510 (7th Cir. 1968), the court found assent under the very specific facts of that case, which do not apply here.

the fact finder is no longer bound by the last manifestation" (quoting *Am. Parts Co., Inc. v. Am. Arb. Ass'n*, 154 N.W.2d 5, 16 (Mich. Ct. App. 1967)). Michigan law does not apply in this case.

Moreover, where there are competing forms and the § 2-207(1) proviso is implicated, nearly every court to consider the issue—including the Sixth Circuit—has found that silence and performance without express objection to the additional terms in the acceptance are not sufficient to signal assent to the additional terms. *See, e.g.*, *McJunkin Corp. v. Mechanicals, Inc.*, 888 F.2d 481, 488 (6th Cir. 1989) (where the buyer issued several purchase orders to the seller over the course of five months, and each shipment from the seller in response was accompanied by an order acknowledgment setting forth the seller's additional terms, finding that the § 2-207(1) proviso applied but that the plaintiff "never explicitly accepted the terms of [seller's] acknowledgment" and that "silence in the face of [the seller's] acknowledgment" did not constitute assent); *Diamond Fruit Growers, Inc. v. Krack Corp.*, 794 F.2d 1440, 1445 (9th Cir. 1986) (holding that the public policy reflected in the enactment of the UCC required "a specific and unequivocal expression of assent on the part of the offeror when the offeree conditions its acceptance on assent to additional or different terms"); *C. Itoh & Co. (Am.) Inc. v. Jordan Int'l Co.*, 552 F.2d 1228, 1235 (7th Cir. 1977) (noting that the buyer must "expressly assent[] to the challenged . . . term" under § 2-207(1)).

In its Reply in support of its own motion for summary judgment, SFEG attempts to avoid the result dictated by the cases referenced above by clarifying that it is *not* arguing "that silence or inaction constitutes acceptance." (Doc. No. 100, at 3.) Rather, SFEG's "argument is that Blendtec's repeated ordering, in the face of [SFEG]'s terms and conditions, and without validly sending [SFEG] any competing terms and conditions, is a course of dealing that constitutes

acceptance to [SFEG]'s terms and conditions." (*Id.* (citing *Dresser Indus., Inc. v. Gradall Co.*, 965 F.2d 1442, 1449 (7th Cir. 1992)).)

SFEG apparently conflates the issue of assent with that of ascertaining the terms of the parties' agreement once it has been determined that the § 2-207(1) proviso applies and there was no express assent to the additional terms. In *Dresser*, upon which SFEG relies, the Seventh Circuit presumed without discussion that the § 2-207(1) proviso applied and that the offeror had not expressly assented to the offeree's supplemental or different terms. The court therefore proceeded to determine what the terms of the parties' contract were under § 2-207(3). *See Dresser*, 965 F.2d at 1451 ("We simply hold that, under Wisconsin law, all of the U.C.C.'s provisions should be used in discerning the terms of a contract under § 2-207(3), including those provisions that allow us to examine the parties' performance.").

Here, the court is still on the question of Blendtec's assent to SFEG's Terms & Conditions. Based on *McJunkin* and the other cases cited above, the court finds as a matter of law applied to the undisputed facts that Blendtec's failure to object and continued performance did not constitute assent. Under *Dorton*, "when no contract is recognized under Subsection 2-207(1) . . . because the offeree's acceptance is expressly conditioned on the offeror's assent to the additional or different terms—the entire transaction aborts at this point." 453 F.2d at 1166. Accordingly, no contract was created by the exchange of forms. However, because there is no dispute that the parties' conduct establishes the existence of a contract, the court must resort to § 2-207(3) to ascertain its terms.

### 3. *Application of § 2-207(3)*

SFEG essentially argues that, if the parties failed to create a contract under § 2-207(1), the parties' conduct after the exchange of the forms was nonetheless sufficient under § 2-207(3)

to establish a contract that included the supplementary limitations on warranties and liability contained in SFEG's Terms & Conditions.

As set forth above, § 2-207(3) states that, in a situation where the parties' conduct establishes the existence of a contract even though the writings themselves do not, "the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chapters 1–9 of this title." SFEG argues that the reference to "supplementary terms incorporated under any other provisions of chapters 1–9 of this title" encompasses those terms arrived at through the parties' course of performance and course of dealing. (Doc. No. 100, at 3–4 (citing *Dresser Indus.*, 965 F.2d at 1449).)

SFEG argues that the UCC defines the term "agreement" as "the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade as provided in § 47-1-303." Tenn. Code Ann. § 47-1-201(b)(3). It further insists that Blendtec received SFEG's Terms & Conditions "21 times and repeatedly kept ordering goods. This is not mere silence or inaction. Rather, Blendtec's repeated re-ordering constitutes acceptance, creating a course of performance for Northland's terms." (Doc. No. 100, at 5.)

The fact that Blendtec repeatedly accepted SFEG's performance has no bearing on whether Blendtec assented to SFEG's Terms & Conditions. The court has already determined that silence or inaction, even over the course of repeated transactions, does not constitute "assent" for purposes of § 2-207(1). The actual issues presented by SFEG's argument are (1) whether the parties' course of dealing is encompassed within the supplementary terms of the UCC that may be considered in determining the terms of a contract formed under § 2-207(3); and

(2) if so, whether the course of dealing gives rise to a question of fact as to whether the parties

adopted SFEG's warranty disclaimer and limitation of liability in its Terms & Conditions.

In *Dresser*,[6] the Seventh Circuit recognized that courts and commentators had differed on

the issue of whether parties' course of performance could be considered under § 2-207(3). *See*

*Dresser*, 965 F.2d at 1451 (citing *C. Itoh & Co. v. Jordan Int'l Co.*, 552 F.2d 1228, 1237 (7th

Cir.1977) ("[W]e find that the 'supplementary terms' contemplated by Section 2–207(3) are

limited to those supplied by the standardized "gap-filler" provisions of Article Two."); *Daitom,*

*Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1579 (10th Cir. 1984) (interpreting § 2-207(3)'s

reference to "supplementary terms" as encompassing terms arrived at through the parties' course

of performance, course of dealing, or usage of trade, as well as the UCC's stock gap-fillers); 2

W. Hawkland, Uniform Commercial Code Series, § 2-207:04, at 109–10 (1990) (discussing

warranties, opining that the parties' course of conduct should be considered in cases involving

§ 2-207(3)); 1 White & Summers, Uniform Commercial Code, § 1–3, at 45 (3d ed. 1988)

(recommending that "supplementary terms" be limited to those expressly provided for in the

UCC's gap-fillers)). The *Dresser* court ultimately held, however, that Wisconsin's version of the

UCC, which is very similar to Tennessee's, permitted courts to consider the parties' course of

performance, course of dealing, and usage of trade, as well as the UCC's gap-fillers, in

determining the terms of the parties' agreement under § 2-207(3):

> We believe that Wisconsin's version of § 2-207(3) is most amenable to the
> approach taken by Professor Hawkland and the Tenth Circuit in *Daitom*. That
> section directs us to fill out a "battle of the forms" contract with "supplementary
> terms incorporated *under any other provisions of chs. 401 to 409*." Wis. Stat. §
> 402.207(3) (emphasis added). Thus, a court is not limited to the standardized gap-
> fillers of Article 2, but may utilize any terms arising under the entire U.C.C. The

---

[6] The other cases on which SFEG relies. *Aqua-Chem*, 2016 WL 6078566, at *4–5, and
*New Moon Shipping Co. v. MAN B & W Diesel AG*, 121 F.3d 24, 31 (2d Cir. 1997), are not
governed by the UCC.

statute's reference to "any other provisions," therefore, necessarily encompasses those sections relating to course of performance (§ 402.208) and course of dealing and usage of trade (§ 401.205). This is the most natural reading of the statute. There is no reason to suppose that the legislature would have used the word "any" if it really meant only the usual gap-fillers. This is not to say that the gap-fillers are unimportant; in cases where the parties' performance gives no indication of their understanding of a particular term, the gap-fillers will supply it. We simply hold that, under Wisconsin law, all of the U.C.C.'s provisions should be used in discerning the terms of a contract under § 2-207(3), including those provisions that allow us to examine the parties' performance.

*Dresser*, 965 F.2d at 1451.

The *Dresser* court's analysis remains, to this court's knowledge, the only comprehensive discussion of the topic. Based on the similarity between Tennessee's and Wisconsin's versions of the UCC, this court believes that Tennessee courts and the Sixth Circuit, if directly confronted with the question, would reach the same conclusion—that all of the UCC's provisions should be used to determine the terms of a contract under § 2-207(3), including those provisions that allow consideration of the parties' course of dealing.

The parties' course of dealing in this case, however, does not permit a conclusion that they have adopted SFEG's Terms & Conditions or that there is even a disputed question of fact in that regard. The term "course of dealing" is defined in the UCC as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Tenn. Code Ann. § 47-1-303(b).[7] Because the record does not reflect that either

---

[7] While SFEG refers repeatedly to course of performance, that term does not apply to the facts here. Section 1-103 defines "course of performance" as

a sequence of conduct between the parties to a particular transaction that exists if:

(1) The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

(2) The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.

party ever invoked any warranties prior to bringing this lawsuit, there is no course of dealing between them with regard to that specific conduct. *Accord Step–Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 104 (3d Cir. 1991) ("Ordinarily, a 'course of dealing' or 'course of performance' analysis focuses on the actions of the parties with respect to a particular issue.").

SFEG does not argue otherwise. Rather, the only course of dealing to which it points is Blendtec's continued performance after repeatedly receiving SFEG's Terms & Conditions. Regardless of how many times Blendtec received SFEG's Terms & Conditions, the court, again, has already concluded that Blendtec's silence and continued performance did not manifest assent to those Terms & Conditions for purposes of § 2-207(1). It would be illogical to conclude that silence and continued performance, standing alone, may nonetheless constitute a course of dealing under § 2-207(3), thus bringing in through the back door the same terms rejected at the front door.

In *Dresser*, the Seventh Circuit indeed held that the district court properly permitted the jury to consider the parties' course of dealing and affirmed the verdict in favor of the plaintiff-seller based on the application of its warranties. There, however, the parties' course of dealing included "some activity relating to the terms in question." *Dresser*, 965 F.2d at 1451. The evidence showed that the buyer was actually aware of the contents of the seller's warranty and, in fact, had passed the warranty along to its own customers, who had repairs done in accordance with the warranty's terms. In addition, there was evidence that "the custom in the industry was for the manufacturer of a finished product (here, [the buyer]) to adopt the warranties of the companies who sold them parts (here, [the seller])." *Id.* at 1451 n.2.

---

Tenn. Code Ann. § 47-1-303(a). There is no doubt that both parties "performed" under their agreement to buy and sell goods. But they did not "perform" under SFEG's Terms & Conditions. The court therefore presumes that SFEG intends to refer to course of dealing.

The case is therefore distinguishable on the facts from the case at bar, where there is no evidence of activity relating to the terms in question. Those cases more directly on point have consistently declined to find contract terms rejected under § 2-207(1) to be adopted by a course of dealing under § 2-207(3), where the only course of dealing is silence in the face of repeated delivery of the opposing form. *See, e.g.*, *PCS Nitrogen Fertilizer, L.P. v. Christy Refractories, L.L.C.*, 225 F.3d 974, 982 (8th Cir. 2000) ("Moreover, the fact that Christy repeatedly sent its customer acknowledgment form to PCS does not establish a course of dealing; the multiple forms merely demonstrated Christy's desire to include the arbitration clause as a term of the contract."); *Step–Saver Data Sys.*, 939 F.2d at 104 ("Because this is the parties' first serious dispute, the parties have not previously taken any action with respect to the matters addressed by the warranty disclaimer and limitation of liability terms of the box-top license. Nevertheless, TSL seeks to extend the course of dealing analysis to this case where the only action has been the repeated sending of a particular form by TSL.").

In sum, the court finds that the parties' course of dealing may be considered in determining the terms of their agreement under § 2-207(3), but in this case there is no evidence in the record that would permit the finder of fact to conclude that SFEG's Terms & Conditions were adopted by the parties' course of dealing.

### C. Conclusion – Terms & Conditions Motion

The court will grant Blendtec's Motion for Partial Summary Judgment on the question of whether Blendtec's counterclaims are barred by SFEG's Terms & Conditions, as the Terms & Conditions are not part of the parties' agreement. The court will deny SFEG's Motion for Summary Judgment to the extent that it seeks judgment in its favor as a matter of law on Blendtec's counterclaims.

**V.      SFEG's MOTION FOR SUMMARY JUDGMENT**

**A.      Relevant Facts**

The parties began discussing the possibility of a supplier relationship in early 2010 and began actively negotiating in late 2010. At that time, Blendtec's exclusive provider of part sets was Ametek, Inc., a competitor of SFEG's. (Rogers Aff. ¶ 7, Doc. No. 73-14.) In February 2011, Blendtec sent SFEG four test motors. (Doc. No. 86-3, at 3.) On March 11, 2011, Shawn Elgaaen, Blendtec's Manager of Product Engineering (Def.'s Interrog. Answers, Doc. No. 73-17, at 3), wrote to Geordie Mason, then Director of Sales and Marketing and now General Manager of SFEG (Mason Decl. ¶ 2, Doc. No. 73-13), asking if SFEG "could build a motor that matched or exceeded the performance" of the test motors Blendtec had sent. (Def.'s Interrog. Answers, Doc. No. 73-17, at 12.)

By late March 2011, after a period of exchanging emails discussing Blendtec's requirements and SFEG's procedures, SFEG had completed the initial design and drawing process. (March 23, 2011 email from Elgaaen to Mason, Doc. No. 73-10, at 1.) Over the next few months, the parties continued to discuss the development and testing process. Blendtec repeatedly communicated to SFEG that it wanted the parts manufactured by SFEG to meet or exceed those manufactured by Ametek, but it was vague about how to measure performance. It indicated that it expected motors built with SFEG parts to match the "speed/torque test of the motor samples" Blendtec had provided to SFEG, made with Ametek parts. (April 26, 2011 email from Elgaaen to Smith, Doc. No.73-11, at 1.) SFEG indicated that it was attempting to match the testing that Blendtec would ultimately put the prototype samples through in order to compare them to Ametek's product. (April 26, 2011 email from Smith to Elgaaen, Doc. No. 73-11, at 1.)

Geordie Mason knew that Blendtec could not perform the speed/torque test in-house,

because it did not have a dynamometer, the machine used to gather the relevant data. (Mason

Dep. excerpt, Doc. No. 90-2, at 5.[8]) Blendtec therefore relied on SFEG to perform that particular

testing. (*Id.*) Blendtec simply assembled the motors, but SFEG, in providing the field and

armature for each motor, was supplying about 40 percent of the parts for each motor. (*Id.*)

In August 2011, Mason sent Elgaaen an engineering report and test data for the "ongoing

motor program" on which the parties had embarked. Along with this report, SFEG sent four

samples of each model of the part sets it had developed. (Aug. 22, 2011 email from Mason to

Elgaaen, Doc. No. 73-8, at 1.) The engineering report, titled Universal Motor Verification

Testing, was drafted by two SFEG engineers, Chris Smith and Faizul Momen. (Doc. No. 73-8, at

2–19.) It stated that SFEG's purpose was to "[d]esign four motor sets that exceed the current

motor sets being purchased by Blendtec." (*Id.* at 3.) The report summarizes the results of various

tests SFEG had performed on its part sets, compared with the "Competitor Motor" from Ametek,

and purports to show that SFEG's part sets out-performed Ametek's in virtually every category.

The report concluded: "The proposed development of the motor part sets for Blendtec has been

successfully completed. The Northland motor sets exceed the competitors' motor sets in

performance, and Northland is ready to supply Blendtec production ready samples." (*Id.* at 19.)

According to Elgaaen, Blendtec, like SFEG, put the component parts, as installed in

blender motors, through a carrot and water or heat rise test, as well as a "torture chamber" or life

cycle test. (Elgaaen Dep. excerpt, Doc. No. 75-3, at 5.) He also confirmed that, once it was

determined that the new components functioned well enough in these tests, Blendtec's normal

procedure was then to go through beta testing, sending approximately fifty blenders with the

---

[8] Deposition excerpts are scattered throughout the record. For greater ease of reference and locating them within the record, the court cites to them by electronic document number and page rather than by the deposition pagination.

SFEG parts out to employees for use in real-life settings. After the beta testing came the pilot testing, where approximately 500 blenders incorporating SFEG's parts would be sent to actual consumers for use in the field. (*Id.* at 6–9.) Elgaaen testified that the purpose of beta testing is to mitigate risk by "evaluating in a controlled manner the changes or functionality of the product." (*Id.* at 7.) At the pilot stage, typically, the serial numbers of the pilot units would be recorded, so that, if those units were returned for problems, the company could look for those units to disassemble them and evaluate the cause of failure. (*Id.* at 9.) Typically, Blendtec puts new components through both the beta and pilot test phases before moving forward to full production. (*Id.*) The whole point of the protocol is "to determine if there's some problem with the product that [the company] ha[d]n't detected in [its] laboratory testing." (*Id.* at 10; *see id.* ("That is correct. It's a process of mitigating risk.").)

Elgaaen testified that SFEG's part sets passed its preliminary laboratory tests, though not with "flying colors" (Elgaaen Dep. excerpt, Doc. No. 75-3, at 15), and moved on to beta and then pilot testing. On December 29, 2011, Blendtec sent SFEG purchase orders ("POs") for the first and second pilot lots, in quantities of 500 for each part The second PO was expressly contingent on Blendtec's acceptance of the parts ordered in the first. (Dec. 29, 2011 email from Turner to Mason, Doc. No. 89-10; POs 2007387, 2007388, Doc. No. 89-10, at 2–4.) Email exchanges between the parties indicate that issues continued to arise during the first and second pilot lots, but the parties addressed and worked through them. (*See, e.g.*, Doc. Nos. 89-11, 89-12 (documenting changes made between first and second pilot lots).) According to Elgaaen, the first and second pilot lots failed, and the third pilot lot was ordered on April 11, 2012. (Elgaaen Dep. excerpt, Doc. No. 75-3, at 31.) Although a pilot test typically takes three to six months, Blendtec went ahead and ordered a production run (15,000 of each unit) on May 24, 2012, well before the

third pilot test had been completed. (*Id.* at 32–33; PO 2008871, Doc. No. 89-13.) Basically, according to Elgaaen, the part sets never passed Blendtec's final tests, but they were ultimately approved for full production anyway, based on SFEG's representations that it had continued to test the parts, had changed the components to be "almost exactly the same as the Ametek components," and that, by this time, its parts were "as good as or better" than Ametek's. (Elgaaen Dep. excerpt, Doc. No. 75-3, at 12.) Elgaaen claimed that completing the testing according to normal protocol was impracticable because SFEG's design and parts were "in constant flux and change all the way through 2013." (*Id.*)

Issues with SFEG's parts continued to arise thereafter, but the parties' communications from that time period indicate that they intended to, and did, continue to work together to resolve them. (*See, e.g.*, Aug. 3, 2012 email from Elgaaen to Mason, Doc. No. 89-14 (concluding, "Again, this is just to give you a heads up of what is happening. Hopefully we will be able to zero in on these challenges and eliminate them soon."), *and* Aug. 3, 2012 email from Mason to Elgaaen, Doc. No. 89-14 (responding: "I will get the word out that there are some issues[.] Do we need to come in to assist in analyzing the issues? I can have people in ASAP[.]").) The parties worked together through the fall of 2012 to resolve the issues. (*See* Sept.–Oct. 2012 email exchange, Doc. Nos. 89-15, 89-16.) SFEG engineers went to Utah to "rework some of the existing inventory that was suspected of having . . . this fault" that had now arisen. (Rogers Dep. excerpt, Doc. No. 102-7, at 10.)

Other problems appeared toward the end of 2012 and early 2013, but the parties apparently believed they could work through these as well, and Blendtec placed substantial orders with SFEG. The email exchanges between Mason and Elgaaen indicate that both sides were baffled by the problems and trying to determine their source. (Doc. Nos. 89-19, 89-20.) At

some point in 2013, SFEG allegedly began to suspect that they were having a "locked rotor problem." (Mason Dep. excerpt, Doc. No. 90-2, at 9.) Prior to that time, the parties had never discussed locked rotor testing, and it would have been unusual for Blendtec to request it. (Mason Dep. excerpt, Doc. No. 90-2, at 9.)[9]

In February 2013, Mason assured Elgaaen that SFEG's motor was "more efficient than the Ametek design." (Pl.'s Interrog. Answers, Doc. No. 73-17, at 13.) Consumers were still experiencing problems, however, and both SFEG and Blendtec were having difficulty determining why. In March 2013, SFEG employed an outside engineering firm to determine the cause of failure of the "SFG Universal Blender Motor" by comparing it to the Ametek motor and making recommendations for improvement. (Doc. No. 90-1.) SFEG shared the results of the analysis as well as the changes that it intended to implement as a result of the recommendations. (G. Mason Dep. excerpt, Doc. No. 90-2, at 11.)

Meanwhile, in May 2012, Geordie Mason wrote to Blendtec proposing that Blendtec begin using SFEG's electro-graphite brushes in its motor assembly, stating that the material used was "conducive to longer life and superior commutation." (Pl.'s Interrog. Answers, Doc. No. 73-17, at 13.) Mason worked hard for months at trying to sell Blendtec on SFEG's brushes. (Mason Dep. excerpt, Doc. No. 90-2, at 12.) In December 2012, Blendtec asked SFEG to begin working on providing brushes for Blendtec's motors as well. In October 23, 2013, Mason described to Elgaaen the testing that SFEG had conducted on its brushes, emphasizing that its parts could withstand heavy use and were better than Blendtec's current brush. (Pl.'s Interrog. Answers, Doc. No. 73-17, at 13; Oct. 23, 2013 email from Mason to Elgaaen, Doc. No. 92-4, at 1.)

---

[9] Mason explained that blender motors, to be approved for production, had to pass a locked rotor test just to confirm that, if the machine went into a locked rotor mode, it did so safely—that is, it did not catch fire. (Mason Dep. excerpt, Doc. No. 90-2, at 10.) Generally, "motors aren't really designed to survive the [locked rotor] test." (*Id.*)

In the spring of 2014, SFEG reported that its brushes were designed to work across the entire spectrum of motors assembled by Blendtec. (Mason Dep. excerpt, Doc. No. 90-2, at 12.) Brandon Rogers, an engineer employed by Blendtec from 2010 through March 2015, ran some informal tests on the SFEG brush and did not detect any problems. Rogers' testing was in small batches and not subject to any rigorous protocol. (Rogers Aff. ¶ 14, Doc. No. 73-14.) Blendtec then performed the "torture chamber" test on the brushes in residential blenders, which the SFEG brushes passed. (*Id.* ¶ 15.) Neither SFEG nor Blendtec had conducted any testing on SFEG brushes in Blendtec's heavy-duty commercial blender, the "Stealth," prior to using them in production. (Mason Dep. excerpt, Doc. No. 90-2, at 14.) Blendtec did not complete its standard product-evaluation process before approving the use of SFEG brushes and ordering production quantities. (Blendtec's Resp. to SFEG's Statement of Undisp. Facts ¶ 15, Doc. No. 88.)

David Throckmorton, Blendtec's Research and Development Manager (*see* Def.'s Answers to Interrog. No. 1, Doc. No. 73-17, at 3), concedes that testing was not done on the SFEG brush in Stealth, but, he stated, "we believed that we had done initial testing and it worked and we expected it to work in all our products." (Throckmorton Dep. excerpt, Doc. No. 92-13, at 4.) "I expected the product to perform as intended in all of our applications. I expected an equivalent product that would perform the same." (*Id.*)

In April 2014, Blendtec began using SFEG's resin bonded brush in its residential blenders (Rogers Aff. ¶ 14, Doc. No. 73-14.) Blendtec began placing production-quantity purchase orders for SFEG brushes about that time. (Mason Dep. excerpt, Doc. No. 90-2, at 13.) Blendtec began using SFEG's brushes for the Stealth shortly thereafter and started shipping test units in June 2014. (Rogers Aff. ¶¶ 16–17, Doc. No. 73-14.) Mason got word around October 2014 that the one of Blendtec's biggest commercial customers, Jamba Juice, was having major

brush-related problems with the Stealth blenders. (G. Mason Dep. excerpt, Doc. No. 90-2, at 13.)

Although it appears that Blendtec stopped ordering brushes from SFEG in late 2014, the parties continued trying to determine why the brushes were failing, resulting in an unusual number of returns. In January 2015, Blendtec notified SFEG that it had received reports of commutators exploding during testing with the new brushes. (Jan. 15, 2015 email from Seegmiller to Mason and Elgaaen, Doc. No. 90-11; *see also* email exchanges, Doc. Nos. 90-12, 90-13 (dating from Jan. 15, 2015 through Feb. 11, 2015).) Blendtec was unable to replicate the problems, and SFEG suggested running a "locked rotor test," which Blendtec had never done before. (Def.'s Answers to Interrogs., Doc. No. 73-17, at 10.) Blendtec first performed this test on February 11, 2015 and was "finally able to replicate the problems." (*Id.* at 11.)

In February 2015, the parties were still communicating about the locked rotor problem. Brandon had sent back to SFEG six motors that had failed, and an engineer at SFEG performed an "autopsy" on them to determine the cause of failure. Four of the six had had a locked rotor condition. Brandon Rogers wrote to Mason that Blendtec's software allowed the rotor to be locked for two seconds before cutting power, and that length of time was sufficient to raise the temperature enough to destroy the commutator and, thus, the motor itself. (Mason Dep. excerpt, Doc. No. 90-2, at 15.) Rogers' conclusion was that SFEG's commutator played a big part in the problem. (Mason Dep. excerpt, Doc. No. 90-2, at 15 (citing email exchange).)

Marcus Kwong, a Blendtec engineer, testified that he examined over 100 blenders that had been returned because of an overheating problem. He determined that the problem was related to machines that had both an SFEG armature, which includes a commutator, and an SFEG brush. He determined that the Ametek commutator, unlike the SFEG commutator, was reinforced with a steel retaining ring that held the commutator bars in place. When the device

was overloaded, the non-reinforced commutator heated up, causing the bars to raise and hit the brush, causing sparking, excess heat, and other problems. (Kwong Dep. excerpt, Doc. No. 90-15, at 2.) Brandon Rogers explained the problem as follows:

> Q.      So it's a combination of . . . [t]hree things: Locked rotor or something like it[,] . . . the single reinforced commutator, and this particular resin-bonded brush.
>
> A.      Yes.
>
> Q.      So is it fair to say then that the commutators and brushes by themselves are not defective. It's when they are coupled – well, when they are assembled into a motor and then coupled with this other condition?
>
> A.      Yes. We did testing where you could have this commutator with Ametek brushes, it was – it was okay. Or you could have the Northland brushes with the single reinforced commutator, it was okay. It was just when those three things combined that you would have a high chance of failure.

(Rogers Dep. excerpt, Doc. No. 102-7, at 16.)

Meanwhile, it is undisputed that Blendtec was having cash flow difficulties beginning around December 2014. Blendtec claims these issues were related to the numerous returns it was experiencing as a result of SFEG's parts in its blenders. Regardless, for a period of time, Blendtec set up several of its suppliers, including SFEG, on a payment plan. (Christensen Dep. excerpt, Doc. No. 75-1, at 5.) It made some payments toward the amounts it owed SFEG but fell behind its payment plan in February 2015.

SFEG decided to stop shipping product to Blendtec in mid-February 2015. (Wilson Dep. excerpt, Doc. No. 64-5, at 12–13.) The reason for doing so was to pressure Blendtec into submitting payment toward the amounts owed. (*Id.* at 12.) In mid- to late February, Blendtec decided to stop ordering SFEG components. (Def.'s Answers to Interrogs., Doc. No. 73-17, at 7.)

Both parties have produced reports by experts who reach opposing conclusions on whether SFEG's parts lived up to its promises. SFEG's technical expert, Robert Hyatt, opines in

his report that there are no inherent quality or design issues with the SFEG motor parts, but that there is a "design flaw regarding overload protection, provided by the blender's control board and speed sensor, which negatively affects the use of the Northland motor parts, resulting in quality issues." (R. Hyatt Initial Report 1, Doc. No. 73-20.) It was also his opinion that "Blendtec omitted steps of its product development process, which, if conducted, would have increased the likelihood of detecting the problems with its design and avoiding the alleged quality concerns with the Northland motor parts." (*Id.* at 2.)

Blendtec's expert, Fred Smith, testified, to the contrary, that SFEG was aware that Blendtec's blenders were to be used for "robust blending operations," but that the brushes and armatures sold by SFEG to Blendtec were not as good as or better than the Ametek parts and "were not fit for their intended purpose." (Smith Report ¶¶ 83, 85, Doc. No. 73-21.) He testified both that SFEG had reason to know that Blendtec was relying on SFEG's expertise, and that the defect in the commutator was a latent defect that was not discoverable by any standard inspection method. (*Id.* ¶¶ 88, 89.) In fact, the precise problem was not discovered until Blendtec cut the armature apart to discover the flaw in the "commutator reinforcement." (Id. ¶ 88.) He also points out that the supposed problem with Blendtec's control board had never been a problem when used in conjunction with Ametek's parts. (*Id.* ¶¶ 75–76.)

## B.    Analysis

The court has concluded that § 2-207(3) applies and that the terms of the parties' agreement will therefore include "those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chapters 1–9 of this title." § 2-207(3). SFEG argues under this provision that it is entitled to summary judgment because Blendtec's defenses and counterclaims fail as a matter of law under the "UCC default

rules." (Doc. No. 71, at 11.) Specifically, SFEG argues that, under the UCC default rules, Blendtec's defenses and counterclaims are barred because: (1) the alleged express warranty from SFEG that its parts were "as good or better" than Ametek's is puffing as a matter of law; and (2) Blendtec's claim for breach of implied warranties is barred under UCC § 2-316(3)(b), because Blendtec inspected the parts as fully as desired before purchase.[10] Blendtec argues that disputed issues of fact preclude summary judgment in SFEG's favor.

As an initial matter, SFEG points out that Blendtec's pleadings "traveled exclusively under the theory that its terms and conditions apply" and did not actually assert a "violation of any express warranty." (Doc. No. 71, at 15.) SFEG claims that "Blendtec's case has morphed into a claim that Northland promised that its parts would be 'as good or better' than Ametek's." (*Id.*) While it is clear that Blendtec has now abandoned any claims based on SFEG's violation of the warranties contained in Blendtec's terms and conditions, which Blendtec never provided to SFEG, SFEG does not actually argue that Blendtec's claims for breach of express and implied warranties should be dismissed as inadequately pleaded. The court therefore does not address any such argument and instead presumes for purposes of the Motion for Summary Judgment that Blendtec's counterclaims and defenses are sufficiently well pleaded to give SFEG notice of them.

### 1. *Express Warranties and "Puffing"*

Under Tennessee's enactment of the UCC, an express warranty may be created by

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain . . . .

---

[10] SFEG also argues in its motion that Blendtec is barred from any remedy because it failed to give timely notice that SFEG was in breach. In its Reply, SFEG concedes that material factual disputes preclude summary judgment on this basis. (Doc. No. 100, at 10.) The court therefore does not address that issue.

(b) Any description of the goods which is made part of the basis of the bargain . . . .

(c) Any sample or model which is made part of the basis of the bargain . . . .

Tenn. Code Ann. § 47-2-313(1)(a)–(c). On the other hand, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." *Id.* § 47-2-313(2).

SFEG expressly concedes that Blendtec asked it, at the outset of their relationship, if SFEG could build part sets that would "match or exceed the performance" of Ametek's parts (Doc. No. 71, at 15–16), and SFEG represented that it could. SFEG acknowledges that the parties "dispute the breadth of this statement." (*Id*. at 16.) Specifically, SFEG contends that it meant by that representation only that it would meet or exceed Ametek's performance on the specific tests expressly required by Blendtec, while Blendtec insists that SFEG warranted that its parts would be as good as or better than Ametek's "in every respect." (*Id.*) SFEG argues, however, that it is entitled to summary judgment regardless of which factual interpretation prevails, because (1) it is undisputed that SFEG's parts performed as well as or better than Ametek's on the prescribed tests; and (2) "a claim that Northland's parts would be as good or better than Ametek's *in every respect* is puffing as a matter of law and, thus, cannot serve as a warranty." (*Id.*)

The court finds that there is a question of fact as to the scope of SFEG's statements. Blendtec has presented evidence from which a jury could conclude that SFEG did not warrant simply that its parts would perform in laboratory testing as well as Ametek's. SFEG's representations arguably formed the initial basis for the parties' decision to move forward with development of prototypes. Moreover, regardless of whether SFEG's parts passed initial testing, the evidence is clear that SFEG's parts had repeated and continued performance problems when used by consumers in actual blenders, and SFEG continued—for years—to respond to requests

for corrections from Blendtec and to make changes in order to make its parts more like Ametek's. Geordie Mason, SFEG's point person on the project, agreed that SFEG committed to "actually create a motor set that would match or exceed the Ametek in performance" and "not just pass a test." (Mason Dep. excerpt, Doc. No. 90-2, at 5.) Based on the parties' actions, a jury could find that SFEG represented and intended that its parts would perform as well as Ametek's in every respect.

And, contrary to SFEG's assertion, representations that a product is as good as or better in all respects than a competitor's is not always puffery as a matter of law. As observed by leading commentators on the topic, "the recognition that some statements are not warranties tells one nothing about where the line should be drawn between puffs and warranties, and anyone who claims always to be able to tell a 'puff' from a warranty is (we will not hold back) a fool or a liar." 1 White, Summers, & Hillman, Uniform Commercial Code § 10:12 (6th ed.). Likewise, the Sixth Circuit has held that the content of a particular statement does not dictate whether it should be considered "puffing." Context must also be considered. Thus, to determine whether pre-contract statements by the seller

> were in fact a basis of the bargain and thus an express warranty, or whether they were merely a seller's "puffing," the court should consider the circumstances surrounding the transaction, the reasonableness of the buyer in believing the seller, and the reliance placed on the seller's statements by the buyer.

*Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 422 (6th Cir. 1981) (citing 1 A. Squillante & J. Fonseca, The Law Of Modern Commercial Practices 236, s 3:40 (revised ed. 1980)). The question, in short, is whether the statements formed the basis of the bargain. *Id.*

Viewing the totality of the circumstances here in the light most favorable to Blendtec as the non-moving party, the court finds that a reasonable jury could find that SFEG, throughout the course of the parties' relationship, reiterated its position that its parts were as good as or better

than Ametek's and that the representations were not mere puffery. (*See, e.g.*, Elgaaen Dep. excerpt, Doc. No. 92-5, at 2 ("The assertion of equal to or better was made early in 2011. It was made late in 2011. It was made in 2012. It was made in late 2013 while various changes to the design and materials of the armature and field were being made."); Smith Dep. excerpt, Doc. No. 91-6, at 2 (SFEG engineer agreeing that SFEG was hired to "develop a part set that . . . was equivalent or better than that Ametek part set); Aug. 2012 email exchange between Mason and Elgaaen regarding changes to make SFEG's part sets more like Ametek's, Doc. No. 89-14; Feb. 2013 email exchange between Mason and Elgaaen regarding additional testing and changes in attempts to match Ametek parts, Doc. No. 89-19; Feb. 2013 email exchange between Mason and Elgaaen indicating that SFEG was modifying its commutator to match Ametek's; Doc. No. 91-13); March 2013 Report of Findings: Universal Motor Failure Analysis, Doc. No. 90-1 (conducting comparison and analysis of SFEG and Ametek parts, not limited to specific laboratory tests); April 2013 email exchange between Mason and others analyzing differences between Ametek and SFEG armatures, Doc. No. 90-4); June 28, 2013 email from Mason to Elgaaen responding to concerns about SFEG's motor's "performance curve" compared to Ametek's, stating that SFEG's "motor is now basically the same as the competitor's motor right down to wire and lamination geometry" and representing that "there is no reason why we should not be able to match the PHP curve," Doc. No. 91-14); Oct. 2014 email exchange between Blendtec and SFEG regarding which SFEG engineers "worked . . . in the beginning to essentially duplicate the Ametek motor," Doc. No. 91-8.).

In addition, there is evidence that SFEG's engineers knew considerably more about motors than Blendtec and that Blendtec continued to rely on SFEG's expertise, skill and judgment to design and build the parts. (*See, e.g.*, Smith Dep. excerpt, Doc. No. 91-6, at 2 (SFEG

engineer agreeing that Blendtec "was relying on [SFEG's] skill and judgment to design the motor"); *id.* (agreeing that SFEG knew "considerably more about motors"); Mason Dep. excerpt, Doc. No. 90-2, at 6 (agreeing that Blendtec had relied exclusively, for years, on "motor suppliers to produce products that were fit for the blending purpose").) The fact that, every time there was a problem, SFEG stepped in and worked with Blendtec to try to fix it could be interpreted by the fact finder as continued attempts by SFEG to live up to its words—that is, to ensure ultimately that its parts did function as well as Ametek's. And a jury might conclude that Blendtec's continued reliance on SFEG's representations was reasonable, in part, because SFEG continued to make those efforts. *Accord Softub, Inc. v. Mundial, Inc.*, 53 F. Supp. 3d 235, 252 (D. Mass. 2014) (in a factually similar case involving repeated purchase orders and repeated problems over the course of time, denying the defendant's motion for summary judgment, observing that the defendant "offers no developed legal argument as to why, in the absence of an integrated agreement, at least some of the various affirmations it made over the course of the parties' dealings cannot be construed as express warranties").

Clearly, there are facts in the record that support SFEG's position as well. A jury could well question the reasonableness of both Blendtec's continued faith in SFEG after repeated problems and Blendtec's decision to bypass its normal testing protocol, particularly with respect to the brushes and their use in the Stealth blender. In short, however, questions of fact preclude summary judgment on the issues of whether SFEG's statements constituted an express warranty (or a series of express warranties) and, if so, what the scope of the warranty is and whether SFEG breached it.

## 2. *Implied Warranties*

Under the UCC, the warranties of merchantability and fitness for a particular purpose are

typically implied into contracts for the sale of goods. *See* Tenn. Code Ann. § 47-2-314 (implied warranty of merchantability); Tenn. Code Ann. § 47-2-315 (implied warranty of fitness for a particular purpose). SFEG argues that these warranties are waived under UCC § 2-316(3)(b), because Blendtec, a professional buyer, tested the goods as fully as desired and approved them for production, and the goods as manufactured conformed to what the buyer approved and ordered. (Doc. No. 71, at 18.) SFEG argues that Blendtec's usual testing procedure is standard in the industry, that Blendtec failed to follow its usual process and instead skipped many steps, and that, if Blendtec had followed its own standard testing process, the alleged quality issues would have been discovered. (Doc. No. 71, at 20–21.)

Blendtec argues, in response, that the implied warranties are not waived because (1) the defects were latent; (2) SFEG failed to disclose relevant information about the latent defects; (3) SFEG urged Blendtec to rely on SFEG brush testing rather than Blendtec's own processes; and (4) SFEG's parts were a moving target that continuously changed. (Doc. No. 87, at 16.)

UCC Section 2-316(3)(b) states in pertinent part:

> [W]hen the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired . . . there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him.

Tenn. Code Ann. § 47-2-316(3)(b). That is, "a buyer who examines a product cannot rely on a warranty against defects that should have been discovered in the examination." *Barrette Outdoor Living, Inc. v. Vi-Chem Corp.*, No. 2:13-CV-289, 2015 WL 12547568, at *9 (E.D. Tenn. Aug. 31, 2015). However, [b]y its terms, 316(b) applies to patent defects, not latent defects." *Id.*; *see also* 1 White, Summers & Hillman, Uniform Commercial Code § 13:13 n.8 (6th ed.) ("Thus, the buyer will not be held to latent defects or defects ascertainable only by testing procedures not reasonable under the circumstances." (citing UCC § 2-316 cmt. 8)). Whether a particular defect

"ought to appear" from testing depends on the "particular buyer's skill and normal method of examination." *Murray v. Kleen Leen, Inc.*, 354 N.E.2d 415, 420 n.1 (Ill. App. Ct. 1976). Buyers are held to an objective standard of what a buyer of a particular product in his field should know. *Trans–Aire Int'l, Inc. v. N. Adhesive Co.*, 882 F.2d 1254, 1259 (7th Cir. 1989).

The evidence discussed above indicates that Blendtec basically followed its protocol in testing SFEG's parts sets but that problems continued to arise. Further, Blendtec argues that the problem with SFEG's brushes in conjunction with the unreinforced commutator in a locked rotor mode is a latent defect that both parties had difficulty pinning down and, in fact, did not diagnose until early 2015. Moreover, while Blendtec clearly bypassed its normal testing procedures as they related to brushes, there is a factual dispute as to whether beta and pilot testing would have revealed the problem. SFEG's proposed expert testified that, in his opinion, "Blendtec omitted steps of its product development process, which, if conducted, would have increased the likelihood of detecting the problems with its design and avoiding the alleged quality concerns with the Northland motor parts." (Hyatt Initial Report, Doc. No. 73-20, at 2.) Daniel Seegmiller, Blendtec Product Engineer, testified that if a full 500 pilot lot test had been performed on the brushes, the problems with them would likely have been detected. (Seegmiller Dep. excerpt, Doc. No. 75-8, at 6.) However, David Throckmorton could only speculate on whether the problem would have been caught any sooner—for instance, at the beta test stage—because the sample lots or "populations" were so small that it would take a long time to get "meaningful results." (Throckmorton Dep. excerpt, Doc. No. 75-10, at 18–19.)

In sum, there is a question of fact as to whether the problems at issue were latent or patent defects and whether Blendtec's normal testing protocol could or should have detected the

problems earlier. SFEG has not established that it is entitled to summary judgment on this issue either.

### C.     Conclusion – SFEG's Motion for Summary Judgment

For the reasons set forth above, the court will deny SFEG's motion in its entirety.

## VI.     BLENDTEC'S DAMAGES MOTION

### A.     Relevant Facts

In early February 2014, SFEG and Blendtec entered into a Supplier Agreement with a one-year term running from January 31, 2014 to January 31, 2015. (Pl.'s Response to Statement of Undisp. Facts ¶ 21, Doc. No. 83; *see also* Supplier Agreement, Doc. No. 64-11.) The stated purpose of the Agreement was to "ensure the continuity of the supply chain while providing flexibility for both parties to react to potential demand surge." (Doc. No. 64-11, at ¶ 1.) Blendtec agreed to provide SFEG monthly POs for specific requirements of motor part sets (armatures and fields), giving SFEG "30 day lead time on firm order," and, at SFEG's request, a rolling 6-month forecast of product requirements. (*Id.* ¶¶ 2–3.) The Agreement establishes that Blendtec's potential "inventory liability is limited to the firm purchase order quantity of motors 30 days into the future plus the sales value of 10,000 motors and the material value of 35,000 motors beyond the 30 day firm purchase order." (*Id.* ¶ 4.) Beyond that amount, any inventory liability is solely at SFEG's risk. (*Id.* ¶ 5.)

According to SFEG, the purpose of the Supplier Agreement "was that they [Blendtec] were going to give us a six-month forecast of product without firm purchase orders. So for us to accept that six-month forecast, we wanted this assurance that if we bought against a forecast and not a purchase order that they would cover us for 10,000 motors plus the material value of 35,000 motors." (Wilson 30(b)(6) Dep., Doc. No. 86-7, at 2.)

Blendtec's PO 3000763-3 is dated January 19, 2015. (Doc. No. 64-2.) It therefore falls within the term of the Supplier Agreement. (Wilson Dep. excerpt, Doc. No. 99-2, at 4.)

"On January 30, 2015, [SFEG] shipped armatures and fields to [Blendtec] pursuant to Purchase Order No. 3000763-3." (Wilson Decl. ¶ 3, Doc. No. 112.) It did not send the entire amount ordered and, sometime during the first two weeks of February 2015, decided to stop all shipments of product to Blendtec. (Doc. No. 83 ¶ 11; Wilson Dep. excerpt, Doc. No. 64-5, at 12–13 (stating that SFEG put Blendtec on "shipment hold" in mid-February, 2015).) When SFEG notified Blendtec that it would not ship any more product, there were approximately 164,000 fields and 145,000 armatures that had been ordered by Blendtec under PO 3000763-3 but not shipped. (Doc. No. 83 ¶ 15.) SFEG had actually assembled 16,600 of the 164,000 fields that were ordered but not shipped and 11,000 of the armatures that were ordered but not shipped. (Wilson Dep. excerpt, Doc. No. 64-5, at 3.)

SFEG seeks "$1,232,179 in damages for these unshipped assemblies." (Doc. No. 83 ¶ 16.) This figure represents the "net realizable sales value of unshipped assemblies under Purchase Order 3000763-3." (*Id.* ¶ 2.)

PO 3000763-3 specifically states that its payment terms are net 30. (*Id.* ¶ 17.) SFEG never sent an invoice for the unshipped assemblies. (*Id.* ¶ 18.) PO 3000763-3 had a delivery date of June 30, 2015, more than 30 days after SFEG decided to stop shipments. (*Id.* ¶ 25.)

Without citing to any statement of undisputed fact, SFEG asserts that the parties entered into the Supplier Agreement before switching from short-term purchase orders to large, blanket orders on a Kanban system, that is, "a system for electronically signaling the amount of product pulled by Blendtec into production." (Doc. No. 82, at 6 (citing Wilson Decl. ¶ 8, Doc. No. 84).) SFEG does not specifically explain the Kanban system, how it worked, or how it changed the

parties' working relationship.

**B.    Discussion**

Blendtec moves for partial summary judgment on three damages-related issues: (1) whether SFEG is entitled to recover finance charges under SFEG's Terms & Conditions; (2) whether SFEG is entitled to damages for tooling costs; and (3) whether SFEG is entitled to damages for the unshipped assemblies.

The court has already determined, above, that SFEG's Terms & Conditions did not become part of the parties' agreement. Because SFEG's claim for finance charges is premised solely upon the fact that a clause permitting recovery of finance charges is included in its Terms & Conditions, Blendtec is entitled to summary judgment in its favor on that issue. Second, in SFEG's response to Blendtec's motion, SFEG concedes that it is not entitled to recover tooling costs. Summary judgment in Blendtec's favor on that issue is appropriate as well. (Doc. No. 82, at 3–4.)

This leaves SFEG's claims for damages relating to "unshipped assemblies." Specifically, Blendtec argues that SFEG is not entitled to damages related to "motor parts that Blendtec ordered but that SFEG refused to ship and for which SFEG never invoiced Blendtec." (Doc. No. 61, at 3.) It argues that PO 3000763-3 was issued within the term of the Supplier Agreement and that, consequently, Blendtec's "inventory liability is limited to the firm purchase order quantity of motors 30 days into the future plus the sales value of 10,000 motors and the material value of 35,000 motors beyond the 30 day firm purchase order." (Doc. No. 64-2, at ¶ 4.)

In response, SFEG asserts that (1) Blendtec is liable for payment of the unshipped assemblies under Tenn. Code Ann. §§ 47-2-704(2) and -705(1); (2) there are material factual disputes as to whether the Supplier Agreement applies to PO 3000763-3; and (3) even if the

Supplier Agreement applies, there is a material factual dispute as to whether Blendtec breached it first, thereby relieving SFEG of its obligations under the Supplier Agreement. In reply, Blendtec reframes its argument, asserting that "SFEG never sent its acknowledgment accepting the purchase order" and instead informed Blendtec that it was no longer going to be shipping product. (Doc. No. 99, at 3–4.) In other words, Blendtec argues, no contract was formed as to PO 300763-3. In a surreply, filed with the court's permission, SFEG insists that this argument was waived as it was raised for the first time in a reply and that, regardless of whether it sent a formal acknowledgment or acceptance, there is a material factual dispute as to whether it accepted the PO by performance.

### 1.     *Whether a Contract Was Formed*

The court finds that Blendtec's argument that no contract was formed was implicitly incorporated in its original motion. Regardless, for purposes of Blendtec's motion, the court construes the facts in the light most favorable to SFEG and concludes that SFEG's evidence that it made a partial shipment at the end of January 2015, after receipt of PO 3000763-3, if true, could be construed as part performance under the parties' agreement and thus acceptance of the purchase order. The parties' conduct, at least initially, arguably reflected an understanding that they had entered into an agreement.

### 2.     *Tenn. Code Ann. §§ 47-2-704(2) and 47-2-705(1)*

Citing UCC §§ 2-704 and 2-705, SFEG contends that the unshipped assemblies are "goods that Blendtec ordered under the purchase orders, but that Northland did not ship because Blendtec had not paid for goods it had already received." (Doc. No. 82, at 4.) It argues that "when a buyer fails to make payment, a seller may stop shipment on any goods otherwise ready for shipment. And, as to unfinished goods, the seller may 'cease manufacture and resell for scrap

or salvage value or proceed in any other reasonable manner." (Doc. No. 82, at 4.)

Section 2-703 of the UCC addresses "Seller's remedies in general" and concerns situations in which a *buyer* "wrongfully rejects or revokes acceptance of goods or fails to make payment due on or before delivery." Tenn. Code Ann. § 47-2-703. Under such circumstances, the seller may, among other things, "withhold delivery of such goods," *Id.* § 47-2-703(a), or "stop delivery by any bailee as hereafter provided (§ 47-2-705)." *Id.* § 47-2-703 (b). There is no argument here that Blendtec, as buyer, had wrongfully rejected or revoked acceptance of the goods that are the subject of PO 3000763-3.

Section 2-704 cross-references § 2-703, as it pertains to the rights of "[a]n aggrieved seller under the preceding section," Tenn. Code Ann. § 47-2-704(1), that is, a seller aggrieved by a buyer's wrongful rejection or revocation of acceptance of goods. It governs the aggrieved seller's options for disposing of the repudiated goods. Because Blendtec did not repudiate the goods, section 2-704 does not apply here.

Section 2-705(1) provides that an aggrieved seller "may stop delivery of goods in the possession of a carrier or other bailee" under various circumstances. Because there is no hint here that the goods in question were in transit or ever in the possession of a bailee, it does not apply either.

SFEG's arguments under §§ 2-704 and 2-705 are irrelevant.

### 3. The Supplier Agreement

There is no dispute that the Supplier Agreement was duly executed by both parties and that the contract term ran from January 31, 2014 to January 31, 2015. (Supplier Agreement, Doc. No. 64-11.) It expressly provides that "[e]ither party can exit this agreement at any time with a written 30 day notice." (*Id.* ¶ 7.) Neither party contends that there was a written notice to exit the

agreement. SFEG nonetheless argues that there is a disputed issue of fact as to whether the Supplier Agreement governed, pointing to testimony from Mark Christensen, Blendtec's Director of Purchasing, who testified to his understanding that the Supplier Agreement applied to short-term orders placed before the parties implemented a Kanban system for ordering and not to "the blanket PO" issued under the Kanban.[11] (*See* Doc. No. 82, at 6–7 (citing M. Christensen 30(b)(6) Dep., Doc. No. 86-13, at 56–58).) He believed that the parties had moved from a monthly PO to "almost a quarterly PO" around the time they switched to the Kanban system. (Doc. No. 86-13, at 8.) In addition, SFEG's Controller, Ted Wilson, who actually executed the Supplier Agreement on behalf of SFEG, testified that, in his opinion, "the Supplier Agreement was not intended to apply to PO No. 736." (Wilson Decl. ¶ 8, Doc. No. 84.) On the basis of this evidence, SFEG maintains that there is at least a factual dispute as to whether the Supplier Agreement pertained to PO 300763-3 and limits Blendtec's liability for unshipped inventory.

"In 'resolving disputes concerning contract interpretation, [the court's] task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.'" *Planters Gin. Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890–91 (Tenn. 2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). The parties' intent at the time of contracting "is presumed to be that specifically expressed in the body of the contract." *Id.* at 890. Moreover, the "determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Id.* (citing 5 Joseph M. Perillo, Corbin on Contracts, § 24.30 (rev. ed.1998); *Doe v. HCA Health Services of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001)).

---

[11] Counsel for Blendtec objected contemporaneously that this question called for a legal conclusion.

Tennessee courts recognize, however, that "strict compliance with contractual requirements or conditions may be waived by the party in whose favor they were made. Thus, a party may waive its contractual right to receive written notice." *Writzmann v. Baust*, No. No. 87-217-II, 1988 WL 116384, at *3 (Tenn. Ct. App. Nov. 2, 1988) (internal citations omitted). "The waiver need not be express to be effective. It is sufficient if a party's conduct evidences an intent to relieve the other of its duty to comply strictly with the contract. For example, remaining silent when one is expected to speak may later result in an estoppel." *Id.*

Neither party here disputes that the Supplier Agreement was duly executed by both parties and that it reflects their intent at the time they entered into it. SFEG appears to be arguing either that Blendtec waived its right to written notice of termination of the agreement or its right to enforce the inventory liability limitation when it and SFEG implemented the Kanban ordering system.

Blendtec points out that Mark Christensen was not employed at the time the Supplier Agreement was executed and had never actually seen it prior to his deposition. (Christensen Dep. excerpt, Doc. No. 99-1, at 3.) The excerpt submitted by both parties does not reflect that he was asked specifically about Blendtec's potential liability under the Supplier Agreement or whether the Kanban system would even affect that provision of the Supplier Agreement. Ted Wilson agreed, in his 30(b)(6) deposition testimony, that the purpose of the Supplier Agreement was to provide some protection for SFEG in the event that it purchased raw materials in reliance on a six-month forecast, and he agreed that PO 300763-3, dated January 19, 2015, fell within the term of the Supplier Agreement. (Wilson Dep. excerpt, Doc. No. 99-2, at 4.)

SFEG does not explain how the Kanban system obviated the Supplier Agreement or its intention both to protect SFEG and to limit Blendtec's liability for inventory. Neither Wilson's

Declaration nor Mark Christensen's deposition testimony constitutes evidence of either party's intent to waive the written notice requirement or the liability limitation in the Supplier Agreement.

Moreover, SFEG has not established that it is excused from its obligations under the Supplier Agreement by a prior material breach by Blendtec. Ordinarily, a party who first materially breaches may not recover under the contract. *Madden Phillips Const., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009) (citation omitted). However, a non-breaching party may waive its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of a breach.

In this case, first, Blendtec incurred no obligation to provide a "rolling 6 month forecast of product requirements" unless SFEG requested such a forecast. (Supply Agreement ¶ 3, Doc. No. 64-11.) SFEG has pointed to no evidence in the record that Blendtec failed to provide a forecast upon request and thus no evidence of a prior breach of that provision by Blendtec.

Paragraph 2 of the same agreement requires Blendtec to furnish monthly purchase orders "for specific requirements of motor part sets . . . for the upcoming calendar month," thus providing at least "30 day lead time on firm order." (*Id.* ¶ 2.) There is no indication that either party believed that Blendtec breached this provision by not submitting a new purchase order each month. Rather, its purchase orders indicated its needs further into the future and provided well over 30 days of lead time, to the benefit of SFEG. For instance, PO 3000763-1 was issued on July 24, 2014, requesting 100,000 fields and 100,000 armatures to be delivered by December 31, 2014. (Doc. No. 99-6.) Regardless, to the extent Blendtec's failure to submit a monthly purchase order constituted a breach, it is one to which SFEG never objected and instead continued to deal with Blendtec over the course of an entire year of operating under the Supplier Agreement.

Because there is no written withdrawal from the agreement and no evidence supporting a prior material breach by Blendtec or waiver of the inventory liability provision by either party, the court concludes, as a matter of law applied to the undisputed facts, that the Supplier Agreement was in effect and limits Blendtec's liability for inventory.

SFEG does not dispute Blendtec's interpretation of the Supplier Agreement. The court will therefore grant Blendtec's Motion for Partial Summary Judgment limiting damages. According to Blendtec's calculations—which, again, SFEG does not refute or even address—Blendtec's liability for unshipped inventory is limited by the Supplier Agreement to $392,200. The court, however, expresses no opinion regarding whether either party owes damages to the other in this action, the issue of liability not having been resolved.

## VII. CONCLUSION

The court will grant Blendtec's motions (Doc. Nos. 61, 65) and deny SFEG's motion (Doc. No. 70). An appropriate order is filed herewith.

ALETA A. TRAUGER
United States District Judge